1  EVAN C. BORGES (State Bar No. 128706)
2  *eborges@ggtriallaw.com*
   GREENBERG GROSS LLP
3  650 Town Center Drive, Suite 1700
4  Costa Mesa, California 92626
   Telephone: (949) 383-2800
5  Facsimile: (949) 383-2801

6
   CHRISTOPHER W. MADEL (MN Reg. # 230297) (*pro hac vice to be submitted*)
7  *cmadel@madellaw.com*
8  MATTHEW J.M. PELIKAN (MN Reg. # 393065) (*pro hac vice to be submitted*)
   *mpelikan@madellaw.com*
9  MADEL PA
   800 Hennepin Avenue
10 800 Pence Building
11 Minneapolis, Minnesota 55403
   Telephone: (612) 605-0630
12
13 *Attorneys for Plaintiffs*

14           **THE UNITED STATES DISTRICT COURT**
15
16        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17 Molly Moon Films Limited; Motion        Case No.: _____
18 Investment Limited; and Cumulus
   Investors LLC,
19                                          **COMPLAINT AND**
                                            **REQUEST FOR**
20            Plaintiffs,                   **DECLARATORY RELIEF**
21        v.
                                            **JURY TRIAL DEMANDED**
22 ARC Entertainment, LLC; and OA
   Investment Holdings, LLC,
23
24            Defendants.

25

26      Plaintiff Molly Moon Films Limited, made a successful, feature-length

27 motion picture entitled *Molly Moon: The Incredible Hypnotist*. Molly Moon Films

28 Limited contracted with Defendant ARC Entertainment, LLC, to grant certain

---
COMPLAINT

1  distribution rights for the motion picture in the United States and Canada. Despite
2  apparent commercial success and pocketing hundreds of thousands of dollars in
3  fees from the film, ARC has never paid a single dollar under the terms of its
4  contract and has further failed to provide the necessary accounting of the revenues
5  and costs associated with the distribution of the film. This failure by ARC
6  constitutes a breach of the parties' contract on multiple fronts as well as unjust
7  enrichment. The Plaintiffs now seek the Court's assistance in declaring the
8  contract at issue terminated and ordering the reversion of all rights to Plaintiffs, as
9  well as any and all monetary relief to which the Plaintiffs are entitled.

10                    **Parties, Jurisdiction, and Venue**
11                              *Parties*
12       1.   Plaintiff Molly Moon Films Limited is a corporation formed under the
13  laws of England and Wales with its principal place of business at 264 High Street,
14  Beckenham, Kent, BR3 1DZ.
15       2.   Plaintiff Motion Investment Limited is a corporation formed under the
16  laws of the Jersey Channel Islands with its principal place of business at Third
17  Floor, Charter Place, 23-27 Seaton Place, St. Heiler, Jersey, JE4 OWH.
18       3.   Plaintiff Cumulus Investors LLC is a Nevada limited liability company
19  with its principal place of business at 8500 Normandale Lake Boulevard,
20  Minneapolis, Minnesota 55437.
21       4.   Defendant ARC Entertainment, LLC is a Delaware limited liability
22  company with its principal place of business at 3212 Nebraska Avenue, Santa
23  Monica, California 90404.
24       5.   Defendant OA Investment Holdings LLC is a Delaware limited liability
25  company with its principal place of business at 555 Twin Dolphin Drive, Suite 615,
26  Redwood City, California 94065.
27                              *Jurisdiction*
28       6.   The Court has jurisdiction over this action under 28 U.S.C. § 1332(a).

*Venue*

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (2).

# Facts

## I.   Distribution Agreement

8. Plaintiff Molly Moon Films Limited ("MMF") produced and ultimately holds the rights to a feature-length motion picture entitled *Molly Moon: The Incredible Hypnotist* (the "Motion Picture").

9. Plaintiffs Motion Investments Limited and Cumulus Investors LLC are the primary investors in MMF and the Motion Picture and are entitled to royalties and profits derived from the distribution sale, and all other exploitation of the Motion Picture.

10. In July 2015, MMF and Defendant ARC Entertainment, LLC, ("ARC") entered into an agreement (the "Distribution Agreement") (attached as **Exhibit A**) for ARC to distribute the Motion Picture within the United States and Canada.

11. The Distribution Agreement granted ARC rights to license, sub-license, distribute, exhibit, advertise, promote, market, and publicize the Motion Picture for theaters, home use and digitally. (Ex. A ¶ 6.)

12. The Distribution Agreement also allowed ARC to collect royalty income earned by the Motion Picture and to retain portions of this income to cover ARC's costs and fees, as well as for ARC to potentially earn a profit. (Ex. A ¶ 6(g).)

13. In consideration for the rights conferred by the Distribution Agreement, ARC was obligated to make payments under the contract. (Ex. A ¶¶ 7, 8 & 9.)

14. These payments included a series of advance payments totaling eighty-thousand U.S. Dollars ($80,000):

    a. Sixteen thousand U.S. Dollars ($16,000) due within thirty (30) days from when the Distribution Agreement was executed, subject to the receipt of chain-of-title documents and a W-9 from MMF, (Ex. A ¶ 7(a));

b. Thirty-two thousand U.S. Dollars ($32,000) due within thirty (30) days following delivery as defined in Paragraph 11 of the Distribution Agreement, (Ex. A ¶ 7(b));

c. Thirty-two thousand U.S. Dollars ($32,000) due no later than October 31, 2015, provided that MMF complied with Paragraphs 7(a) & (b) of the Distribution Agreement, (Ex. A ¶ 7(c)).

15. All conditions outlined for payment of the advance have been met:

a. More than 30 days have passed since the Distribution Agreement was executed and ARC received both chain-of-title documents and a W-9;

b. MMF has met all delivery obligations under Paragraph 11 of the Distribution Agreement;

c. MMF has complied with the other advance conditions and it is later than October 31, 2015.

16. In addition to the advance payment, ARC was obligated to pay performance bonuses based on the overall sales of the Motion Picture:

a. For sale of "Videograms," between twenty-five and one-hundred thousand U.S. Dollars ($25,000 to $100,000), (Ex. A ¶¶ 7(d)(i)–(iv));

b. For a sale to broadcast television, twenty percent (20%) of net receipts, (Ex. A ¶ 7(d)(v));

c. For transactional VOD buys between twenty-five and fifty thousand U.S. Dollars ($25,000 to $50,000), (Ex. A ¶¶ 7(d)(vii)–(viii)).

17. In further addition to the advance payments and performance bonuses, ARC was obligated to pay a portion of net revenues and net receipts, once ARC had recouped the defined distribution costs and its own

share of the net receipts. (Ex. A ¶¶ 8 & 9.)

18. To assist the parties in determining the amount of net revenues, net receipts, and overall payments due under the terms of the Distribution Agreement, ARC was obligated to provide accounting statements at regular intervals and to make its books open to inspection. (Ex. A ¶ 17.)

19. If a dispute arose over any accounting statement provided (or not provided) by ARC, the Distribution Agreement provided MMF with two (2) years to object in writing to ARC.

20. In the event that the Motion Picture failed to make any revenue within the first two (2) years, the Distribution Agreement provides MMF with the right to cancel the agreement and for a full reversion of rights upon sixty (60) days written notice. (Ex. A ¶ 5.)

21. Any failure by a party to fulfill its obligations under the Distribution Agreement is not a breach of the agreement until the non-breaching party has provided written notice to the breaching party and provided thirty (30) days for the breaching party to cure the breach. (Ex. A ¶ 21.)

22. Failure to pay the advance payments specified in Paragraph 7 of the Distribution Agreement is ground for a termination of the agreement and complete reversion of rights. (Ex. A ¶ 21.)

## II.    Defendants' Breach of Distribution Agreement

23. As of the date of this Complaint, ARC has never paid any money to Plaintiffs under the terms of the Distribution Agreement.

24. This failure to pay any money constitutes a breach of Paragraph 5, 7, 8, and 9 of the Distribution Agreement.

25. As of the date of this Complaint, ARC has provided only minimal, terse communications, none of which is a satisfactory accounting of net revenues or net receipts under Paragraph 17 of the Distribution Agreement.

26. The first such communication was received on September 30, 2016, over a year after execution of the Distribution Agreement. The September 30, 2016 communication referenced distribution expenses totaling $215,586.39, but failed to provide any representation as to overall costs, revenues, or quantities sold or distributed.

27. The second communication was sent by Grace Chong on November 2, 2016.

28. The third communication was sent by Grace Santos on February 28, 2017.

29. Neither of these later communications contained the information required in the accounting statements under Paragraph 17 of the Distribution Agreement. Those communications stated that:

> By way of history, ARC sold all its rights and interest to OA resulting in employee terminations, transition issues, delays, etc.   OA used Alchemy as its Distributor and they were also in charge of producing the Accounting Statements. Unfortunately, as you are probably aware, Alchemy filed for Chapter 7 bankruptcy in July 2016.  As a result of the bankruptcy, a few of us have been hired as contractors to get everything back up to speed.  Again, we do apologize for the delays.
>
> Alchemy: Subdistribution Agreement; no MG; terminated
> Starz: Sublicense Agreement; Fee $50K. Start Date 2/1/16. 18 months
> Showtime: Sublicense Agreement; Fee $25K. Start Date 2/1/16.
> 24 months

30. On information and belief, Defendant OA Investment Holdings LLC ("OA Investments") is the successor to some or all of the rights and obligations that the Distribution Agreement conferred to ARC. This information and belief are based on a September 14, 2015 "First Amendment" agreement, which stated that the May 21, 2015 Distribution Agreement "has now been assigned by ARC to OA Investment Holdings LLC."

31. Neither OA Investments nor any successor or agent has made any

payments under the Distribution Agreement or provided further communications, including, but not limited to, the accounting statements mandated by Paragraph 17 of the Distribution Agreement.

**III.    Plaintiffs' Notice of Breach and Defendants' Opportunity to Cure**

32. On September 8, 2017, Plaintiffs wrote to ARC and OA Investments under Paragraph 21 of the Distribution Agreement to notify them of the multiple breaches of the agreement as well as to demand a full accounting of revenues and receipts as authorized under Paragraph 17. (The September 8, 2017 letter is attached as **Exhibit B**.)

33. The September 8, 2017 letter also invoked Paragraph 5 of the Distribution Agreement to trigger the sixty (60) day notice period in the event that no revenue has ever been generated for the Motion Picture.

34. The registered agent for ARC returned the September 8 letter as undeliverable, but the letter was also sent to ARC's primary place of business and not returned. Emails to ARC representatives were not returned.

35. The letters sent to OA's registered agent and primary place of business were not returned.

## Count 1

*Breach of Contract*

*All Defendants*

36. Plaintiffs reallege paragraphs 1 through 35 as if fully stated herein.

37. A valid contract exists between Plaintiffs and Defendants, resulting in the transfer of distribution rights to the Motion Picture in return for monetary consideration.

38. Plaintiffs have fully complied with the performance required under this contract.

39. Defendants have failed to perform their obligations under the contract, in whole or in part, because of failure to make any payments under the contract.

40. Defendants have further failed to perform their obligations under the contract, in whole or in part, because of failure to provide accounting statements they are required to provide under the contract.

41. Defendants' refusal to make these payments and to provide these accounting statements to Plaintiffs has resulted in harm to Plaintiffs.

## Count 2

### *Breach of Implied Covenant of Good Faith and Fair Dealing*

### *All Defendants*

42. Plaintiffs reallege paragraphs 1 through 41 as if fully stated herein.

43. A valid contract exists between Plaintiffs and Defendants, resulting in the transfer of distribution rights for the Motion Picture.

44. Plaintiffs have provided all of the performance required under the terms of the contract.

45. Defendants are obligated to meet their obligations under the terms of the contract, including, in part, payment of all advance payments due from Defendants to Plaintiffs.

46. Defendants' failure and refusal to make these advance payments constitutes interference in Plaintiffs' right to receive benefits under the terms of the contract.

47. Defendants' failure and refusal to make payments due to Plaintiffs under the terms of the contract have harmed Plaintiffs.

## Count 3

### *Unjust Enrichment*

### *All Defendants*

48. Plaintiffs reallege paragraphs 1 through 47 as if fully stated herein.

49. Plaintiffs have conferred substantial benefit to Defendants in the form of distribution rights for and potential revenue collection from such distribution

1    of the Motion Picture.

2       50. By failing and refusing to make payments to Plaintiffs in

3    consideration for the substantial benefits enjoyed by the Defendants, the

4    Defendants seek to unjustly retain a benefit to which they are not entitled.

5                  **PRAYER FOR RELIEF**

6    WHEREFORE, Plaintiffs respectfully pray for a judgment against Defendants

7    for:

8    1. Declaratory Relief in the form of an Order stating that the Distribution

9       Agreement has been breached and is terminated and that all rights conferred

10      by the Distribution Agreement, including but not limited to all rights to the

11      Motion Picture, revert to Plaintiffs.

12    2. Injunctive and equitable relief as the Court deems appropriate including an

13      order enjoining the Defendants from:

14      a. distributing the Motion Picture;

15      b. representing to any third parties or the public that Defendants hold any

16        rights to the distribution or otherwise to the Motion Picture;

17      c. communicating or interfering with third parties or the public regarding

18        Plaintiffs' rights to or future distribution of the Motion Picture.

19    3. Compensatory damages to be paid by all Defendants;

20    4. Costs and attorneys' fees of this lawsuit, with interest;

21    5. Such other and further relief as the Court may deem appropriate.

1  DATED:  December ___, 2017        GREENBERG GROSS LLP

2

3

4                                              By:        /s/ Evan C. Borges

5                                                    Evan C. Borges
                                                     Attorneys for Plaintiffs
6

7                                              MADEL PA
                                                     Christopher W. Madel (*pro hac vice to be*
8                                                    *submitted*)
                                                     Matthew J.M. Pelikan (*pro hac vice to be*
9                                                    *submitted*)
                                                     Attorneys for Plaintiffs
10

11

12                      **<u>DEMAND FOR JURY TRIAL</u>**

13          Plaintiffs, by and through their attorneys of record, hereby demand a trial by

14  jury.

15

16  DATED:  December ___, 2017        GREENBERG GROSS LLP

17

18

19                                              By:        /s/ Evan C. Borges

20                                                    Evan C. Borges
                                                     Attorneys for Plaintiffs
21

22                                              MADEL PA
                                                     Christopher W. Madel (*pro hac vice to be*
23                                                    *submitted*)
                                                     Matthew J.M. Pelikan (*pro hac vice to be*
24                                                    *submitted*)
                                                     Attorneys for Plaintiffs
25

26

27

28

COMPLAINT

# EXHIBIT A

## DISTRIBUTION AGREEMENT

**THIS DISTRIBUTION AGREEMENT (this "Agreement"), dated as of May 21, 2015 (the "Effective Date"), is entered into by and between ARC Entertainment, LLC, a Delaware limited liability company with an office address at 3212 Nebraska Avenue, Santa Monica, California 90404 ("ARC"), and Molly Moon Films Ltd, a corporation formed under the laws of England and Wales, with an office address of c/o Amber Entertainment (UK) Limited, Suite 604, Liberty House, 222 Regent Street, London W1B 5TR England ("Licensor"). All capitalized terms (other than paragraph headings) are defined as set forth herein.**

1.  Intentionally deleted.

2.  Grant of Rights.  Licensor hereby licenses and grants exclusively to ARC, throughout the Territory and during the Term, the Rights Granted in all languages in and to the feature-length motion picture presently entitled "*Molly Moon: The Incredible Hypnotist*," directed by Christopher N. Rowley and starring Emily Watson and Dominic Monaghan, including all elements and versions of all of the foregoing (collectively, the "Picture"), EXCLUDING rights to any sequels, prequels, remakes or spinoffs (including, without limitation, television or web series based on the Picture or any of the underlying characters or themes) (the "Reserved Subsequent Production Rights").

3.  Additional Materials.  Licensor hereby licenses and grants, exclusively to ARC (subject to Licensor's underlying agreements with third parties existing as of the date hereof or entered into hereafter with ARC's prior written consent), during the Term and in the Territory, all rights in any and all media now known or hereafter devised, under copyright and otherwise, in an to all such additional materials owned, controlled and/or available to Licensor, fully cleared and authorized by Licensor for ARC's unrestricted use and exploitation as permitted hereunder, as ARC may require for the preparation, distribution and exploitation of the Picture hereunder, including, without limitation, all supplemental footage and materials related thereto that are owned or controlled by, and/or available to, Licensor, such as bonus material, deleted scenes, outtakes, behind-the-scenes footage, screen tests, promotional films, theatrical trailers, production stills, production storyboards, animatics, concept drawings and production sketches.  The Picture will be deemed to include any and all such materials provided by Licensor to ARC and any and all materials created or obtained by ARC for purposes of exploiting any or all of the Rights Granted.

4.  Territory.  "Territory" means (a) the United States and Canada and their respective territories, possessions and commonwealths, including, without limitation, the U.S. Virgin Islands, Puerto Rico and Guam; (b) Army, Navy, Air Force, Red Cross and other national or governmental installations as well as oil rigs and other commercial and/or industrial installations, wherever any such facilities and installations are located, to the extent that sales are made and/or servicing thereof is performed within the United States or Canada or their respective possessions, territories or commonwealths; and (c) ships, aircraft and carriers flying the flag of the United States or Canada, wherever located.

5.  License Term; Term.  The "License Term" of this Agreement will commence on the Effective Date and, subject to the exercise of the Licensor's Early Termination Right (as defined below) will continue for a period of seven (7) years from the date that Complete Delivery is made in accordance with the terms of this Agreement; provided, however, that the License Term shall automatically extend for an additional three (3) years commencing immediately upon the expiration of the aforementioned seven (7) year period (the "Extended Term") if ARC has not fully recouped all Distribution Expenses, the Advance and the Performance Bonus(es), if any, prior to the expiration of such seven (7) year period. ARC shall have an additional six (6) month sell-off period (the "Sell-Off Period") following the expiration of the License Term and the Extended Term (if any) during which Sell-Off Period ARC will have the right to continue to market, distribute and account for · all previously manufactured Videograms remaining in inventory. The "Term" means the term of this Agreement and is the period commencing on the Effective Date and continuing through the expiration of the License Term, the

Ex. A - 1

Extended Term and the Sell-Off Period. Notwithstanding anything to the contrary set forth in this Agreement, in the event that, for a continuous period of not less than two (2) years during the Term, ARC has not generated any Net Revenues, Licensor shall have the right, upon sixty (60) days prior written notice to ARC ("Termination Notice"), to terminate this Agreement on a prospective basis (i.e., any licenses entered into by ARC prior to the date of service of such Termination Notice shall remain in place notwithstanding Licensor's termination and all rights and Rights Granted herein (subject to those granted in respect of any Existing Licenses) shall revert, and be deemed to have reverted, to the Licensor upon expiry of the sixty (60) day period notified in the Termination Notice ("Early Termination Right").

6. <u>Rights Granted</u>. Subject to any Third Party Restrictions (as defined in paragraph 11(c)) and the terms and conditions of this Agreement, the "<u>Rights Granted</u>" shall mean the following distribution rights in and to the Picture, in any and all media now known or hereafter devised throughout the Territory, under copyright and otherwise:

    a. "<u>Theatrical Rights</u>": the exclusive right to license, sub-license, distribute, exhibit, advertise, promote, market, publicize and in all manner and form exploit and turn to account the Picture, and to authorize others to do all of the foregoing, by any and all means of display in conventional or drive-in motion picture theaters that are open to the general public and where a fee is charged for admission.

    b. "<u>Non-Theatrical Rights</u>": the exclusive right to license, sub-license, distribute, exhibit, advertise, promote, market, publicize and in all manner and form exploit and turn to account the Picture, and to authorize others to do all of the foregoing, in prisons, educational institutions, libraries, museums, businesses, clubs, summer camps, hospitals and other similar institutions, and on army bases, oil drilling rigs, ships-at-sea and airlines that are operated by a shipping line or flying the flag of the Territory, by all means of exhibition, display, broadcast, or transmission, and all other forms of public performance.

    c. "<u>Videogram Rights</u>": the exclusive right to design, manufacture, produce, distribute, license, sub-license, lease, rent, exhibit, promote, market, advertise, publicize and in all manner and form exploit and turn to account the Picture and all elements thereof, and to authorize others to do all of the foregoing, by means of and in connection with "<u>Videograms</u>," which for purposes hereof includes, without limitation, videocassettes, videodiscs, videotapes, DVDs, High-Definition DVDs, Blu-ray discs, Universal Media Discs, CD-ROM, DVD-ROM and all other hard carrier devices now known or hereafter devised and designed to be used in conjunction with a personal reproduction, player or viewing apparatus which causes a visual image (whether or not synchronized with sound) to be seen on a screen, display or device, e.g., a television receiver, computer display, hand-held device or any other screen, display or device now known or hereafter devised, which Videograms also include menus, other navigational designs and elements and such other materials (e.g., "bonus" materials) as ARC determines in its sole discretion. Videogram Rights shall include the exclusive rights (i) to distribute the Picture through standard retail channels by means of download to any tangible or hard carrier Videogram storage device using any and all forms of digital or electronic transmission to the retailer; (ii) to distribute Videograms through internet-based retailers (e.g., Amazon.com and Walmart.com); (iii) to perform and exhibit (via downloading or streaming) short clips of the Videograms for purposes of marketing and selling hard-carrier devices; (iv) in conjunction with the sale of a Videogram unit, to authorize digital copies thereof; and (v) to use Videograms of the Picture or any portions or excerpts or abridged versions thereof to in-pack or on-pack or as premiums to be sold together with other products or items

    d. "<u>Digital Rights</u>": the exclusive right to distribute, license, sub-license, lease, rent, exhibit, promote, market, advertise, publicize and/or otherwise exploit and turn to account the Picture and/or any elements thereof, and to authorize others to do all of the foregoing, by and in connection with any and all means of dissemination to members of the public via the internet, "World Wide Web" or any other form of digital, wireless and/or electronic transmission now known or hereafter devised,

Ex. A - 2

including, without limitation, streaming, downloadable and/or other non-tangible delivery to fixed and mobile platforms including, without limitation, personal and other computers, cell phones, personal and other communication devices, personal and other digital devices, personal and other music, video and/or other audiovisual recorders and/or players, and/or via "podcast" and/or via all other personal, digital, mobile and other devices, platforms and services whether now known or hereafter devised.

e.  "PPV/VOD Rights": the exclusive right to license, sub-license, distribute, exhibit, transmit, advertise, promote, market, publicize and in all manner and form exploit and turn to account the Picture by any and all means of pay-per-view and video-on-demand exploitation, including without limitation near video-on-demand and transactional video-on-demand exploitation.

f.  "Television Rights": the exclusive right to license, sub-license, distribute, exhibit, transmit, advertise, promote, market, publicize and in all manner and form exploit and turn to account the Picture, and to authorize others to do all of the foregoing, by any and all means of broadcast television, free television, pay and subscription television, cable and satellite television, subscription video-on-demand, and any and all other forms of television exhibition of the Picture (including without limitation any forms of television exhibition for viewing over a cellular phone, personal computer, pda or other mobile device) regardless of the technology employed.

g.  "Royalty Income":  To the extent that Licensor controls such rights, Licensor also authorizes and grants to ARC, by itself or through an appropriate collecting organization, to collect on behalf of Licensor all amounts collected by any collecting society, authors' rights organization, performing rights society or governmental agency, arising from all royalties, levies and remuneration imposed by law or collectively managed including, but not limited to: audio-visual royalties for secondary or simultaneous retransmission by means of any cable, satellite, microwave, internet, closed network or other system, any simulcasting or catch-up TV, tax rebates, exhibition surcharges, or levies on blank Videograms if the actions generating such income occur within the Territory during the Term or any applicable distribution term, no matter when such sums are paid.  Royalty Income means all such sums paid or     payable directly from the applicable collecting organization(s) to Licensor or ARC which will be included in Net Revenues.

h.  "Incidental Rights": Subject to the Third Party Restrictions (delivered in accordance with and as defined under Clause 11 c. below), the usual and customary incidental rights in connection with the Picture, including, but not limited to, the following: (i) the right to use any and all elements of the Picture and all Delivery Materials (including, without limitation, the names, voices, pre-approved likenesses and biographies of all persons appearing in and/or connected with the Picture (as supplied to ARC by the Licensor), subject to any contractual restrictions of which Licensor gives ARC timely written notice), and any portions thereof, in connection with the publicity, advertising, marketing and packaging of the Picture and/or the institutional promotion of ARC, including, without limitation, the right to reproduce, distribute and exhibit any and all visual images and/or sound recordings contained in the Picture and/or the Delivery Materials throughout the Territory, by any and all means of distribution, and in any and all media now or hereafter known or devised; (ii) the right to change the title of or otherwise modify or edit modify or edit the Picture to meet the requirements of (A) censorship, community standards, M.P.A.A. rating purposes, to meet television broadcaster standards, practices and timing requirements, to create home entertainment versions of the Picture, to create marketing and promotional materials including wireless/internet "downloads" (e.g., screen grab stills and clip excerpts for promotional purposes), or as required by law, court order, and/or in settlement of a dispute (or to avoid any claim or dispute); and   (B) all contractual and guild credit requirements for paid advertising, publicity and promotional packaging, applicable to the Picture; (iii) the right to prepare closed-caption versions of the Picture for the hearing-impaired; (iv) subject to any Third Party Restrictions, the right to dub or add subtitles to the Picture in  any language; (v) the right to include in the audiovisual encoding of the Picture other programs, trailers, promotions, contests, and advertising for ARC's other motion pictures, products and services; and (vi) the right to

3/30

Ex. A - 3

sublicense any of the Rights Granted upon such terms and conditions as ARC, in its sole but reasonable discretion, may deem proper or expedient.

   i.   "<u>Reserved Rights</u>": All distribution rights not expressly granted to ARC herein, including, without limitation, all Reserved Subsequent Production Rights and all allied and ancillary rights thereto (e.g., without limitation, merchandising and soundtrack rights), shall be reserved and retained by Licensor.

7.   <u>Advance</u>. In consideration for the grant to ARC of the Rights Granted and for Licensor's entering into and fully performing this Agreement, and provided that Licensor is not in uncured material breach or default of any of its representations, warranties or agreements hereunder, ARC shall pay to Licensor an advance equal to Eighty Thousand Dollars (USD $80,000) (the "<u>Advance</u>"), which Advance will be payable as follows following ARC's receipt of a corresponding invoice therefor:

   a.   Sixteen Thousand Dollars (USD $16,000) will be payable within thirty (30) days following (i) the full execution of this Agreement; (ii) complete delivery and acceptance, in ARC's sole discretion, of the chain of title documentation specified in **Schedule A** (not to be unreasonably withheld or delayed) and (iii) receipt of an original W-9 tax form completed by Licensor;

   b.   Thirty Two Thousand Dollars (USD $32,000) will be payable within thirty (30) days following Complete Delivery pursuant to Section 11 below; and

   c.   Thirty Two Thousand Dollars (USD $32,000) will be payable within sixty (60) days following the initial Videogram release of the Picture in the Territory, but in no event later than October 1, 2015, provided this Agreement has been fully executed as of such date and Licensor has complied with Section 7(a) and 7(b).

   d.   In addition to the Advance, Licensor may be entitled to the following performance bonuses (individually and collectively, the "<u>Performance Bonus</u>") out of monies and/or revenue credited to and/or received by ARC for (1) Videogram sales of units to Redbox Automated Retail, LLC (a "<u>Redbox Order</u>"); (2) retail Videogram sales; (3) receipts derived from broadcast television rights ("<u>Broadcast TV Sale</u>"); and (4) pay-per-transaction VOD through set top TV boxes offered through Comcast, Time Warner, Dish Network, Direct TV and similar "traditional" cable or satellite TV providers where the customer pays for each individual video on demand program ("<u>Transactional VOD</u>"):

   i.   In the event of a full Redbox Order of thirty thousand (30,000) Videograms, a one-time payment in the amount of Twenty Five Thousand Dollars ($25,000), which will be prorated to Twelve Thousand Five Hundred Dollars ($12,500) in the event of a half Redbox Order of fifteen thousand (15,000) Videograms;

   ii.   In the event that seventy five thousand (75,000) full-priced Videograms are sold at North American point-of-sale retail within twelve (12) months of release, an additional one-time payment of Twenty Five Thousand Dollars ($25,000), or 3.43% of the wholesale revenue amount should Videograms be sold for less than full price.

   iii.   In the event that one hundred twenty five (125,000) full-priced Videograms are sold at North American point-of-sale retail within twelve (12) months of release, an additional one-time payment of Twenty Five Thousand Dollars ($25,000), or 5.14% of the wholesale revenue amount should Videograms be sold for less than full price.

   iv.   In the event that one hundred fifty thousand (150,000) full-priced Videograms are sold at North American point-of-sale retail within twelve (12) months of release, an additional one-time payment of Twenty Five Thousand Dollars ($25,000), or 10.29% of the wholesale revenue amount should Videograms be sold for less than full price.

v.   In the event of a Broadcast TV Sale, twenty percent (20%) of the Net Receipts in relation thereto;

vi.   In the event the Transactional VOD buy exceeds One Hundred Fifty Thousand Dollars ($150,000) during the Initial General VOD Release of the Picture (defined herein as starting on the initial release of the Picture on Transactional VOD and ending ninety (90) days later), a one-time payment in the amount of Twenty Five Thousand Dollars ($25,000); and

vii.   In the event the Transactional VOD buy exceeds Two Hundred Fifty Thousand Dollars ($250,000) during the Initial General VOD Release of the Picture (defined herein as starting on the initial release of the Picture on Transactional VOD and ending ninety (90) days later), a one-time payment in the amount of Twenty Five Thousand Dollars ($25,000).

viii.   Any Performance Bonus is fully recoupable by ARC out of all other sums payable to Licensor under Section 9(d).

8.   <u>Net Revenue and Net Receipts</u>.   "Net Revenue" means all amounts actually credited to and/or received by ARC from the exploitation of the Rights Granted on a non-refundable basis; and "Net Receipts" means Net Revenue less all of the following:

a.   All refunds, rebates, credits, discounts, allowances, returnable advance payments from retailers, customers or exhibitors (until earned or forfeited) and returnable security deposits from retailers, customers and exhibitors (until earned or forfeited);

b.   With respect to Videograms of the Picture, a reserve for returns in an amount equal to ARC's projection of the percentage of Net Revenue that will constitute returns for the Picture, which must not in any event exceed twenty-two and a half percent (22.5%) of Net Revenue arising from current Videogram exploitation/inventory (the "Return Reserve"); provided that each addition to the Return Reserve will be liquidated within six (6) months of its establishment, but ARC will nevertheless make reasonable efforts to liquidate such Return Reserve regularly, to the extent it was not applied to actual returns and such liquidated Return Reserves in excess of actual returns will be added back to Net Receipts; and

c.   Actual returns in excess of the Return Reserve.

9.   <u>Allocation of Net Receipts; Cross-Collateralization</u>.   All Net Receipts derived from the distribution of the Picture hereunder will be allocated on a continuing basis as follows:

a.   First, ARC will retain a distribution fee ("Distribution Fee") in an amount equal to twenty percent (20%) of the Net Receipts;

b.   Then, ARC will retain one hundred percent (100%) of all further Net Receipts until it has fully recouped, from amounts that would otherwise constitute Licensor Receipts, all Distribution Expenses;

d.   Then, ARC will retain one hundred percent (100%) of all further Net Receipts until it has fully recouped the Advance and Performance Bonus (if any paid to Licensor). Any payments to Licensor hereunder shall be directed to the following account (or such other bank account or bank account details as shall be notified to ARC hereinafter in writing):

i.   Coutts & Co.
440 Strand, London WC2R 0QS
Account Natme: Stichting Freeway Custody re: Speranza 13
Account Number: 05181739
Sort Code: 18-00-02
Swift Code / Bic: COUTGB55

5/30

Ex. A - 5

IBAN number GB88COUT18000205181739
Reference (Must be quoted):  Molly Moon / territory;

d.  Then, from Net Receipts actually credited to and/or received by ARC, Licensor will be entitled to all further Net Receipts ("Licensor Receipts") provided that any Performance Bonus paid to Licensor under Section 7(e) above will be applied against and in reduction of Licensor Receipts.

e.  ARC makes no representation or warranty that the Picture will generate any Net Receipts, Performance Bonus or Licensor Receipts or any particular amount thereof.

f.  The Advance, the Performance Bonus and all Distribution Expenses for the Picture will be cross-collateralized among all countries in the Territory and all Rights Granted.

10.  Distribution Expenses.  "Distribution Expenses" means any and all actual reasonable and verifiable costs and expenses directly and verifiably incurred in connection with the exercise and exploitation of any of the Rights Granted including expenses incurred in connection with the manufacture, production, exhibition, distribution, marketing, advertising, sublicensing, subdistribution, exploitation and turning to account of the Picture, exclusive of salaries and overhead, less any discounts, credits, rebates or similar allowances, actually paid by ARC for exploiting each Granted Right. in arms-length transactions with third parties.  All third-party expense deductions will be accounted for at actual and verifiable costs with no "up-charges" or additional interest accruals.  For the avoidance of doubt, all Distribution Expenses, excluding any costs for marketing and/or advertising, shall be capped at Two Hundred Thousand Dollars ($200,000) (the "Cap"), except for additional expenses, being expenses not falling within the Cap, as and when approved in advance by the Licensor in writing.  Notwithstanding the foregoing, ARC acknowledges and agrees that the Distribution Expenses associated with the replication of Videograms (for clarification, assembly of finished goods is included in the costs of replication), distribution of Videogram units and Videogram returns handling fees will not exceed Eighty Cents ($0.80) per Videogram Unit, One Dollar and Forty Cents ($1.40) per Videogram unit or Forty Cents ($0.40) per Videogram Unit, respectively, without the prior consent of Licensor.

11.  Delivery; Other Licensor Obligations.

a.  "Complete Delivery" means complete delivery and acceptance, in ARC's sole good faith discretion (not to be unreasonably withheld or delayed), of all of the delivery materials including, but not limited to, all masters, key artwork, trailer, English/Spanish/French Sub-titled tracks (if available) in addition to an English language audio track, and all other materials identified in **Schedule B** ("Delivery Materials") attached hereto and incorporated herein. Licensor shall make delivery of the Delivery Materials to ARC or such other place as ARC designates, at Licensor's sole cost and expense, no later than July 24, 2015 ("Delivery Date").  Any reasonable and verifiable direct out-of-pocket costs incurred by ARC related to Complete Delivery or the Delivery Materials shall be recouped as a Distribution Expense.  Acceptance by ARC of less than all of the Delivery Materials shall not be construed as a waiver by ARC of any or all of Licensor's obligations to deliver any Delivery Materials hereunder.  Time is of the essence of this Agreement with respect to Licensor's Delivery on or before the Delivery Date.  Without limiting any of ARC's others rights and remedies, ARC shall have the right to terminate this Agreement and be reimbursed by Licensor for any actual reasonable and verifiable out-of-pocket costs incurred by ARC in connection with the Picture if Licensor fails to deliver the Picture as required on or before the Delivery Date.

b.  Licensor will be solely responsible for all third party clearances, all residual costs and all royalties payable to third parties, including, without limitation, all music clearance costs, guild (including, but not limited to, the SAG, WGA and DGA) and union residuals and other payments, and all third party profit participations and other contingent compensation associated with the Picture (collectively "Third Party Payments"). In the event Licensor defaults on its Third Party Payments obligations and the respective third party demands payment from ARC or threatens to encumber

6/30

Ex. A - 6

the Rights Granted herein, ARC may, at its discretion, pay the applicable third party out of sums otherwise payable to Licensor and recoup the same as Distribution Expenses. Licensor shall submit the Picture to the MPAA; provided, however, that in the event that ARC is required to submit the Picture to the MPAA, then the cost of submitting the Picture to the MPAA shall be included as part of the Distribution Expenses.

c.  Licensor will inform ARC in writing, no later than the Delivery Date of the Picture, of any contractual third party restrictions and other reasonable restrictions on the use of any of the Delivery Materials for the Picture, including, without limitation, clips and footage for use in ARC's advertising and marketing campaign and the use of the names, likenesses and biographies of all persons appearing in and/or connected with the Picture ("Third Party Restrictions").

d.  Notwithstanding anything to the contrary herein, the sole remedy of ARC for a failure for any reason by Licensor to deliver the Delivery Materials will be the return of the Minimum Guarantee and/or Distribution Expenses previously paid and unrecouped (or such portion thereof) and ARC shall under no circumstances be entitled to lost profits, consequential damages or any equitable or injunctive relief.

12. Marketing Plan. ARC agrees to submit to Licensor in writing a marketing plan ("Marketing Plan") for the general exploitation of the Picture and Licensor shall have a right of meaningful consultation and prior review in respect of the Marketing Plan and shall, more particularly, have the following specific rights of approval:

a.  in connection with the Marketing Plan, Licensor shall have the right to approve the proposed expenses for marketing and publicizing the general exploitation of the Picture and the marketing strategy (including via DVD retailers, VOD MSOs and digital platforms). Otherwise, the Marketing Plan may include, without limitation, a proposed release date for the Picture, suggested retail prices and retail merchandising and promotions

b.  prior approval of all key artwork, publicity and/or advertising materials to be used in connection with release of the Picture; and

c.  prior approval of the budget and marketing plan for the premiere of the Picture at its first film festival, ("Licensor Approval Rights"),

such approval not to be unreasonably withheld or delayed by the Licensor and, save with respect to the Licensor Approval Rights (which approvals may be deemed to have been accepted if ARC has not received comments within 5 business days of delivery of the relevant materials hereunder, shall be deemed accepted by Licensor), in the event of disagreement between the parties in connection with the Marketing Plan, ARC's judgment and discretion in this respect shall, otherwise prevail.

13. Exclusivity; No Prior Exploitation. Licensor represents and warrants that it has not prior to the date hereof, encumbered, sold, licensed or exploited, nor authorized any other party to encumber, sell, license or exploit, any of the Rights Granted, nor will it do or authorize same in the Territory during the Term.

14. Credits. ARC will use the credit block provided by Licensor on the prints, posters, packaging box and advertising materials for the Picture. ARC will not alter the copyright notice on the Picture, provided that ARC may (i) add a presentation credit for itself and (ii) add its and/or its affiliates', licensees' and/or sublicensees' logos, copyright notice for package design and distribution notice on prints, Videograms, packaging and advertising materials for the Picture. ARC will notify its licensees of the aforementioned credit provisions. No casual or inadvertent failure to accord credits as set forth hereunder will be deemed a breach of this Agreement by ARC. Upon ARC's receipt of written notice from Licensor specifying a breach of the foregoing credit provisions, ARC will use its best efforts to cure such breach on any materials manufactured or prepared after receipt of such notice; but ARC will not be required to replace any existing inventory of Videograms or other materials. Licensor

represents and warrants that the main and end titles of the negative and pre-print materials of the Picture will contain all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Picture who are entitled to receive the same. Licensor shall deliver to ARC as part of the delivery requirements of the Picture a complete statement in English setting forth the credits as they appear on the screen. In addition, Licensor shall deliver to ARC a complete statement setting forth the names of all persons to whom Licensor is contractually obligated to accord credit in any advertising, publicity or exploitation of the Picture.

15. <u>Access to Materials</u>.

   a.  During the License Term subject to Subparagraph (c) below, upon Licensor's written request and at ARC's discretion, ARC will provide Licensor, on a quitclaim basis, with access to any materials created by ARC or under its direction in connection with the exploitation of the Picture ("<u>ARC Materials</u>") for use by Licensor or Licensor's authorized licensee(s) solely outside of the Territory after the applicable holdback periods to be notified to Licensor, provided Licensor pays for (i) the actual duplication and shipping costs related to such access; and (ii) one-hundred percent (100%) of ARC's unrecouped Distribution Expenses in connection with creating such ARC Materials.

   b.  After the expiration of the License Term subject to Subparagraph (c) below, upon Licensor's written request, ARC will provide Licensor, on a quitclaim basis, with access to any ARC Materials, provided Licensor pays for (i) the actual duplication and shipping costs related to providing Licensor such ARC Materials; and (ii) one-hundred percent (100%) of ARC's unrecouped Distribution Expenses in connection with creating such ARC Materials.

   c.  ARC makes no representations or warranties as to rights or clearances in or to the ARC Materials. Licensor represents and warrants that (i) the use and exploitation of the ARC Materials by Licensor or its licensee(s) will not interfere with ARC's quiet enjoyment of the Rights Granted during the Term; (ii) ARC will not have any obligations to any third party who is authorized by Licensor to access the ARC Materials; (iii) Licensor shall obtain any necessary clearances for its (or its licensees') distribution and use of the ARC Materials; and (iv) no payments will be required to be made by ARC to any third party in connection with the exploitation or use by Licensor or its licensees of the ARC Materials hereunder (or, if any such payments are required, Licensor will be solely responsible therefor and indemnify and hold harmless ARC in connection therewith).

16. <u>Insurance</u>.  During the Term, Licensor will maintain, at its sole cost and expense, an Errors and Omissions policy of insurance with respect to the Picture which has limits of not less than $1,000,000 per occurrence / $3,000,000 in the aggregate per year, and a deductible of not more than $25,000 (the "<u>E&O Policy</u>").  The E&O Policy will indicate if defense costs are included within the limits of liability for the policy.  The current Best's Insurance Rating for the insurance carrier shall be no less than "A."  Licensor will include ARC, its subsidiary and affiliated companies and their respective officers, directors, employees, agents, exhibitors, licensees and assignees as additional insureds on the E&O Policy.  The E&O Policy may terminate no earlier than three (3) years after ARC's initial Videogram release in the Territory of the Picture. The E&O Policy will contain a provision that the carrier will give ARC at least thirty (30) days' advance written notice of any cancellation, modification or expiration of the E&O Policy and any such cancellation, modification or expiration (other than termination as permitted above) will be subject to prior written approval by ARC.  The E&O Policy will specify that it is primary insurance coverage and not contributory or excess coverage (notwithstanding that ARC may also have its own insurance coverage) and will contain no exclusions of coverage for title, music or Videogram distribution nor any other non-standard exclusion.

17. <u>Accounting Statements; Payments; Finality</u>.

   a.  During the first two (2) years of the Term, ARC will render or cause to be rendered to Licensor quarterly accounting statements (each such quarter, an "<u>Accounting Period</u>" and each such statement, an "<u>Accounting Statement</u>") within forty-five (45) days after the last day of the applicable Accounting Period; provided, however, that no Accounting Statement need be

rendered for any Accounting Period in which no Net Revenue is received, and no check for payment need be issued for any Accounting Period in which monies due to Licensor equal less than One Hundred Dollars ($100). Monies payable to Licensor hereunder with respect to each Accounting Period will be paid within thirty (30) days after the rendering of the Accounting Statement with respect to such Accounting Period. After the expiration of the second calendar year of the Term, Accounting Statements will be prepared and delivered to Licensor semi-annually based on said calendar year, within sixty (60) days after the end of each semi-annual period. After the expiration of the fourth calendar year of the Term, Accounting Statements will be prepared and delivered to Licensor annually within [sixty (60)] days after the end of each respective year; provided, however, that if the Picture is reissued generally the quarterly statements will be resumed for one year after such reissue commences. If no statement is received by the Licensor for a period of six (6) months or more, then ARC will provide a statement within [one (1) month] of the Licensor's written request.

b.  Licensor will be deemed to have consented to all Accounting Statements rendered by ARC or its assignees, licensees or successors, and all Accounting Statements will be binding upon Licensor and will be deemed an account stated and not subject to any objection by Licensor for any reason, unless specific written objection to such Accounting Statement is received by ARC within two (2) years from the date such Accounting Statement was rendered. In the event that Licensor makes a timely written objection to an Accounting Statement, Licensor will have two (2) years from the date of such written objection to bring suit; thereafter, Licensor will be deemed to have finally and conclusively waived such objection.

c.  ARC will maintain accurate records of all financial transactions regarding the Picture using generally accepted accounting principles on a consistent, uniform and non-discriminatory basis until three (3) years after the Term and during any period while a dispute about payments remains unresolved. The records will include information of all gross receipts derived at source, all recoupable distribution costs paid, all allowed adjustments or rebates made, all cash collected or credits received, and all other information necessary to render any statement due. If ARC permits any off-set, refund or rebate of sums due to ARC, such sums will nonetheless be included in gross receipts reporting. ARC will also maintain full and accurate copies of every statement, contract, electronic record, audit report, material correspondence and other records for the Picture and make available such records for inspection and copying at ARC's principal place of business pursuant to the audit provisions listed in paragraph 17.d. below.

d.  Licensor will have the right, at Licensor's sole cost and expense and upon thirty (30) days' written notice to ARC, to audit ARC's records relating to ARC's distribution of the Picture hereunder in order to verify the Accounting Statements issued by ARC hereunder. Any such audit shall be conducted only by an independent certified public accountant experienced in entertainment industry audits, during reasonable business hours and in such a manner as not to interfere with ARC's normal business activities. In no event shall an audit with respect to any Accounting Statement commence later than two (2) years from the delivery of the Accounting Statement involved; nor shall any audit continue for longer than thirty (30) consecutive days; nor shall audits be made hereunder more frequently than once annually during the Term; nor shall the records supporting any Accounting Statement be audited more than once; nor shall the auditor be entitled to any form of contingency or success fee. If ARC, as a courtesy to Licensor, includes cumulative figures in any Accounting Statement, the time within which Licensor may commence any audit or make any objection in respect of any Accounting Statement shall not be enlarged or extended thereby. Licensor shall have no right to examine records relating to ARC's business generally or with respect to any audio-visual works other than the Picture hereunder, for purposes of comparison or otherwise, unless such records also relate to the Picture hereunder. Any audit will be at the Licensor's expense unless such audit revealed, and the parties mutually settled such audit and agreed, that payments due to Licensor for the audited period were understated by more than ten percent (10%) in which case, ARC agrees to promptly reimburse Licensor to the extent of its reasonable, out-of-pocket, verifiable, third-party costs of such audit.

9/30

e.  If ARC makes any verifiable overpayment to Licensor for any reason, Licensor shall pay to ARC an amount equal to such overpayment on written demand, or at ARC's election, ARC may deduct and retain for its own account an amount equal to any such overpayment from any sums that may become due or payable by ARC to Licensor or for the account of Licensor, provided that in either event, ARC shall have provided Licensor in advance with a statement of such overpayment together with evidence in support of the same.

18. <u>Distribution, Exploitation and Holdbacks</u>.

a.  Subject to the provisions of paragraph 12, ARC will have the right, as it may determine in its sole discretion, (a) to determine the wholesale and suggested retail price of Videogram units of the Picture; (b) to determine the parties, consideration and all other terms and conditions of any agreement entered into by ARC for the exploitation of the Rights Granted; (c) to settle any claim with respect to any such agreement or the Rights Granted; and (d) to distribute free or promotional Videograms and to erase or destroy Videograms.

b.  The Picture (which for purposes of this Paragraph will include any linear clips exceeding two (2) minutes in duration) shall not be previewed or otherwise exhibited in the Territory without ARC's prior, written approval.  Following the execution of this Agreement, the Picture shall not be exhibited at any film festival, within the Territory, prior to the initial general commercial release of the Picture in the Territory without ARC's prior written approval.  Licensor will use its reasonable endeavours to procure its distributors, licensees and assigns outside the Territory to employ industry standard geofiltering, copy protection, security and encryption procedures.

19.   <u>Representations and Warranties and other Agreements</u>.

a.  Licensor hereby represents, warrants and agrees that:

i.   Licensor is a limited liability company validly organized and existing and in good standing under the laws of England and Whales, with its principal place of business at London

ii.  Licensor has the full right, power, legal capacity, and authority to enter into and perform this Agreement and to grant exclusively to ARC hereunder all of the Rights Granted, and that Licensor will not encumber (save pursuant to customary guild, completion guarantor and financier liens), sell, license, exploit, turn to account or otherwise dispose of (other than as set forth in this Agreement) any of the Rights Granted in and to the Picture and all elements thereof in the Territory, including without limitation all performance, distribution, exhibition, advertising and all other rights therein;

iii.  **Schedule A** sets forth all documents relevant to the chain-of-title of the Picture;

iv.  consent or release of no other person, firm or entity is necessary in order for Licensor to enter into this Agreement and grant the Rights Granted to ARC;

v.   So far as the Licensor is aware, the execution, delivery, and performance of this Agreement by Licensor does not and will not violate or contravene any certificate of incorporation, by-laws, or other agreement or other instrument to which Licensor is a party or by which Licensor is bound and, assuming due execution by ARC, will be valid and binding on, and enforceable against, Licensor after its execution by Licensor;

vi.  With respect to the Picture, there are (as at the date hereof) no actual or threatened liens, claims, encumbrances, legal proceedings, restrictions, agreements, or understandings which will or might conflict or interfere with, limit, derogate from, or be inconsistent with, or otherwise affect any of the provisions of this Agreement and/or any of the obligations or representations

10/30

and warranties of Licensor contained herein and/or the enjoyment by ARC of any or all of the Rights Granted;

vii. So far as the Licensor is aware, no claim has been made that Licensor does not or may not have any of the Rights Granted, and there is not now valid or outstanding, and Licensor will not hereafter grant, any right in connection with the Picture which is or would be adverse to, or inconsistent with, or impair, the Rights Granted; no portion of the Picture has been taken from any other work and there has been no claim that the Picture violates, conflicts with, or infringes upon, and the Picture does not violate, conflict with or infringe upon, any rights whatsoever including without limitation any copyright, common law or statutory right anywhere in the world; any right of publication, performance, or any other right in any work; nor does the Picture constitute or contain any libel, slander, invasion of privacy or defamation of any person, or entity; neither the Picture nor any elements thereof are the subject of any third party claim; and the Picture and all elements thereof and all Delivery Materials will be fully cleared by Licensor for all distribution and uses set forth herein, and no payments will be required to be made by ARC to any third party in connection with the exploitation of the Picture hereunder (or, if any such payments are required, Licensor will be solely responsible therefor and indemnify and hold harmless ARC in connection therewith);

viii. The main and end titles, credit block and all publicity, promotion, advertising and packaging information and materials with respect to the Picture will (A) contain all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Picture who are entitled to receive such credit; and (B) fully comply with all applicable contractual, guild, union and statutory requirements and agreements;

ix. The Picture shall be completely finished, fully edited and titled and fully synchronized with language, dialogue, sound and music, recorded with sound equipment pursuant to valid licenses, and in all respects ready, and of a technical quality adequate for general release in first-class theaters in the Territory; and

x. Licensor has paid and will continue to pay during the Term (and any extension thereof, as applicable) all obligations and sums due in connection with the Picture, including salaries, copyright fees, residuals, deferments, participations, guild payments including, but not limited to, SAG, ACTRA, WGA, WGC, DGA, DGC or equivalent body, or pursuant to any guild or collective bargaining agreement, union, and synchronization, mechanical, and performance fees and royalties payable in connection with the production, manufacture, and ARC's exploitation of the Rights Granted in the Picture in the Territory, and Licensor will hold ARC and its third parties harmless from and against any claim, loss, damages or expenses arising out of or in connection therewith.

b. ARC hereby represents and warrants that:

i. ARC is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in the State of California; and

ii. ARC has the full right, power, and authority to enter into and perform this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

iii. So far as ARC is aware, there are no claims, facts or circumstances existing or pending that would prevent ARC's full performance of its obligations hereunder;

iv. ARC shall honour all restriction on the exercise of the Rights Granted and shall not by any act or omission impair or prejudice the copyright in the Picture; and

11/30

    v.   ARC has not nor shall not make any grant, assignment or agreement that will be in violation of the Licensor's rights in the Picture as provided in this Agreement (including, without limitation, Licensor's right to receive proceeds hereunder).

20.  <u>Indemnities</u>.  Licensor will defend, indemnify and hold harmless ARC, any parent, affiliate, distributor, licensee or assignee of ARC, and its and their respective owners, shareholders, members, managers, officers, directors, employees and agents from and against all third-party claims, losses, liabilities, actions, judgments, costs and expenses of any kind (including without limitation reasonably and properly incurred outside attorneys' fees and costs) (collectively, "<u>Claims</u>") arising out of or in connection with (a) any exploitation of the Rights Granted or any other rights hereunder; (b) any the contents of the Picture; (c) any other material of any kind supplied by Licensor hereunder; (d) any illegal act committed by Licensor in connection with the Picture; (e) the use by Licensor or any third party of the ARC Materials accessed by or provided to Licensor; or (f) any breach by Licensor of any representation, warranty, covenant or agreement set forth in this Agreement.  ARC will defend, indemnify and hold harmless Licensor, any parent, affiliate, distributor, licensee or assignee of Licensor, and its and their respective owners, shareholders, members, managers, officers, directors, employees and agents from and against all Claims, arising out of or in connection with (x) any illegal act committed by ARC in connection with the Picture; or (y) any breach by ARC of any representation, warranty, covenant or agreement set forth in this Agreement.

21.  <u>Remedies; Cure Period</u>.  Without limiting the provisions of paragraph 23, in the event of any breach of this Agreement by ARC, Licensor's sole remedy will be an action for money damages at law. Notwithstanding the foregoing, in the event that ARC fails to pay the Advance (or any part thereof) when due, Licensor may terminate this Agreement.  Licensor expressly waives any and all equitable rights Licensor may have hereunder and in no event will Licensor have any right to enjoin, rescind, or otherwise interfere with the distribution, advertising, marketing, publicity and/or any other exploitation by ARC of the Picture or any of the Rights Granted hereunder.  Except for the failure of ARC to pay the Advance when due and the provisions set forth under Paragraph 5, Licensor expressly waives any right to terminate the Rights Granted hereunder .  No failure by either party to fulfill any of its obligations hereunder will constitute a breach of this Agreement by such party unless and until the non-breaching party has provided the breaching party with written notice specifying such failure(s) and the breaching party has failed to cure such breach within thirty (30) days after receipt of such notice; provided, however, that the foregoing cure period will not apply (and there will be no cure period with respect to) Licensor's Delivery obligations.

23.  <u>Dispute Resolution</u>.

    a.   All disputes arising under this Agreement that cannot be resolved informally will be submitted for binding arbitration before a single arbitrator (who shall have experience in the entertainment industry) in Los Angeles, California pursuant to the rules of the American Arbitration Association. The award of the arbitrator will be final and binding and may be entered for judgment in any court of competent jurisdiction in Los Angeles County.  Any dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement) that may not be arbitrated pursuant to applicable state or federal law may be heard only in a court of competent jurisdiction in Los Angeles County.  The parties shall each bear their own respective costs and attorneys' fees.

    b.   If either party becomes insolvent, or a petition under any bankruptcy or insolvency law shall be filed by or against the defaulting party or any property of the defaulting party is attached and such attachment is not released within 30 days or if the defaulting party executes an assignment for the benefit of creditors, or if a receiver, custodian, liquidator or trustee is appointed for the defaulting party, then the non-defaulting party shall have the right to terminate this Agreement and, if in such case the non-defaulting party is the Licensor all Rights Granted shall revert automatically and immediately to the Licensor.

12/30

c.  If ARC terminates this Agreement for any reason then all Rights Granted to ARC hereunder shall automatically revert (without further formality) to Licensor to hold the same absolutely and any licenses or sub-licenses executed by ARC prior to the date of termination shall continue to their full term, provided that ARC shall be entitled to receive any unrecouped Advance, Distribution Expenses or Performance Bonuses and to receive and retain its Distribution Fee from any revenues from ARC's exploitation of the Picture before such termination.

d.  Notwithstanding the foregoing, Licensor acknowledges that a breach of any of its representations and warranties contained in paragraph 19 (ii) herein may cause immediate, irreparable damage to ARC that cannot be readily ascertained or remedied by damages in an action at law, and ARC shall at all times be entitled to seek equitable remedies, including without limitation injunctive relief in respect to any exploitation of the Picture in the Territory, from any court of competent jurisdiction in Los Angeles County, California.

24. Notices.  All notices, accountings, payments and any other document that either of the parties is required or may desire to serve upon the other party ("Notices") must be in writing and shall be deemed to have been duly given or made: (a) if sent by personal delivery, on the day it is delivered; (b) if sent by registered or certified mail, postage prepaid and return receipt requested, on the fifth day after depositing in the mail; (c) if sent by a nationally-recognized overnight or express courier, all postage and other charges prepaid, on the next business day after it is sent; or (d) if sent by facsimile or email, when received, but in any event not later than the next business day immediately after the date of transmission, provided however that, unless receipt of a facsimile or email notice is acknowledged in writing by the recipient, notice sent by facsimile or email shall require a follow-up notice by personal delivery, registered or certified mail or overnight courier within twenty-four (24) hours after the facsimile or email transmission.  Notices to ARC will be sent to ARC at 3212 Nebraska Avenue, Santa Monica, California 90404, Attention: Business and Legal Affairs; and Notices to Licensor will be sent to Licensor's address set forth on the first page of this Agreement, Attention: Lawrence Elman; or to such other address that one party may hereafter designate in writing to the other.

25. Assignment.  This Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns.  The parties may freely assign or transfer this Agreement or any of its rights under this Agreement, but no such assignment or transfer will relieve the assigning party of its obligations under this Agreement, unless it is to a company which acquires all or substantially all of it's assets and fully assumes all of the obligations hereunder.

26. Confidentiality.  Licensor and ARC each acknowledges that the terms and conditions of this Agreement and all information and data provided by each party to the other pursuant to this Agreement (collectively, "Confidential Information") are confidential.  Each of Licensor and ARC agrees that it will not use Confidential Information for any purpose other than in connection with the performance of its obligations or the exercise of its rights under this Agreement, or disclose Confidential Information to any person other than its officers, employees, agents, representatives, attorneys, accountants, financiers, banks, distributors, wholesalers, retailers, exhibitors, licensees and permitted assignees on a need-to-know basis only, or unless compelled by law, subpoena or court order to disclose same.  Neither party will issue any press release or public announcement which mentions the actual terms of this Agreement or the Picture without the prior written approval of the other party; provided however that either party may make public statements without the other party's consent regarding the fact that it has a business relationship with the other party and that ARC distributes the Picture.

27. Entire Agreement.  This Agreement is the complete and final agreement between the parties with respect to the subject matter hereof.  This Agreement does not evidence or constitute a partnership, joint venture, partnership/agent or other fiduciary relationship between them. This Agreement will be construed in all respects in accordance with the laws of the State of California applicable to agreements entered into and to be wholly performed therein.  This Agreement may not be changed or modified, or any covenant or provision hereof waived, except by an agreement in writing.  Paragraph

Ex. A - 13

headings are used in this Agreement for convenience only, and will not be used to interpret or construe the provisions of this Agreement. No delay in enforcing any right under this Agreement will constitute a waiver of such right.

28. Counterparts. This Agreement may be executed in counterparts, each of which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or as a pdf document attached to an email shall be equally effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart by facsimile shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not effect the validity, enforceability, or binding effect of this Agreement, and the parties hereby waive any right they may have to object to said treatment.

ACCEPTED AND AGREED:

**MOLLY MOON FILMS LTD.** ("Licensor")

By: _____

Its: _____DIRECTOR_____

Date: _____July 28 2015_____

**ARC ENTERTAINMENT, LLC** ("ARC")

By: _____

Its: _____Trevor Drinkwater_____

Date: _____July 29, 2015_____

14/30

Ex. A - 14

## SCHEDULE A

### Chain of Title Documents

All documents evidencing ownership of the Picture from initial underlying elements (e.g., screenplay, book or stage play option/purchase, or writer employment) through to the completed motion picture, including evidence of filing of all applicable documents with the U.S. Copyright Office (e.g., Form PAs for each of the screenplay and the completed motion picture, and recordation with Document Cover Sheets of all documents evidencing ownership and transfer of all underlying rights to the production entity), and all documents evidencing proof of payment in connection with any transfer of rights.

**SCHEDULE B**

**<u>DELIVERY MATERIALS FOR "MOLLY MOON: THE INCREDIBLE HYPNOTIST"</u>**

These delivery requirements shall be deemed incorporated into that certain Distribution Agreement, dated as of February __, 2015 (the "Agreement"), by and between ARC Entertainment, LLC ("ARC") and **[_____]** ("Licensor") in connection with the motion picture entitled "*Molly Moon: The Incredible Hypnotist*" (the "Picture"). Any capitalized terms used in this Schedule B but not otherwise defined shall have the meaning ascribed to such term in the Agreement. Licensor will deliver of each and every item listed below to ARC at 3212 Nebraska Avenue, Santa Monica, California 90404, or to such other location as ARC may designate in writing, at Licensor's sole cost and expense.

Licensor's obligations in connection with the Picture shall not be complete until Licensor has physically delivered every item and element listed below. With respect to the access and loan of any materials, Licensor shall adhere to the terms and conditions set forth in the laboratory access letter attached hereto as Exhibit A.

The technical quality of all elements shall conform to current practice for commercially acceptable technical quality motion pictures made by major motion picture studios in Los Angeles, California. All prints, negatives, tapes and soundtracks referenced herein shall be first generation (e.g. unused) elements, and shall have no physical damage of any kind including, but not limited to, spots, scratches, abrasions, dirt, cracks or tears. All splices in the negatives shall be sound, secure and transparent when viewed by projected light. Producer will order and pay directly for 100% Quality Reports at an approved laboratory and include with their delivery of physical materials.

All titles (main, end, translation, locales, dates, etc.) must be high enough on screen to allow for two lines of subtitles for any dialogue/narration occurring during the titles. Additionally, the lettering of the titles shall appear within 1.33:1 TV aspect ratio "safe title area" for any television exhibition of the Picture.

**<u>A.  BASIC PICTURE ELEMENTS</u>**

Licensor shall provide access to all 35mm film elements (positive and negative) and audio tracks, as necessary, including, without limitation, 35mm print(s) for screening and access to DCP or any other files created for theatrical exhibition. The DCP package spec is as follows:

1.  One (1) Interop Non-Ghostbusted format, **unencrypted** 2K JPEG 2000 DCI compliant digital cinema package of the feature (DCP) produced from the DCDM files and color corrected to X'Y'Z color space, in original theatrical aspect ratio, in separate reels, saved onto hard drive(s).

2.  Synced audio: 5.1 WAV files (L, R, C, LFE, Ls, Rs) at 24fps, in sync with the Picture reels, provided on the hard drive with the Picture.

3.  DCP to be delivered with the distribution Key Delivery Message (KDM) (unlocking key).

4.  As above with fully **non encrypted** files.

**<u>B.  VIDEO ELEMENTS</u>**

All video mastering will originate from Hi-Definition and must be HD CAM-SR 1080P, 23.98pfs, with stereo, M & E and 5.1 streams. All video materials should be clearly labeled in English and indicate the exact runtime, frame rate, and audio track configuration. All video masters will include textless backgrounds for all titles and inserts after the end credits on the last part of the master. The timecode of textless material must match the timecode of the texted material on the master. All video masters

16/30

Ex. A - 16

should be unsubtitled. Alternatively content may be delivered on a drive using APPLE PRO RES 4-2-2- 4HQ and all Pro- Tools sessions. All features must also have d/m/e splits provided as pro tools sessions.

1. _16x9 HD CAM SR Master_
   Physical delivery of one (1) Hi-Definition 16x9 (original aspect ratio) video master.  Audio must be as follows: Ch.1 Stereo Composite Left, Ch.2 Stereo Composite Right, Ch.3 Stereo Music & Effects Left, Ch.4 Stereo Music & Effects Right, Ch.5-11 Dolby 5.1 Printmaster.

2. _1080i Broadcast Master_
   One (1) 1080i/59.95 HDCam master in original aspect ratio.

3. _Digital Betacams_
   The following Digital Betacam down-conversions shall be manufactured from the HDCam SR:

   i.  Digital Betacam NTSC 16x9 conformed to the original aspect ratio of the PICTURE

   ii. Digital Betacam NTSC 4x3 Full Frame (pan & scan), drop frame, 1:33.

## C.  MASTER SOUND MATERIALS
All audio master materials to be delivered on Firewire 400/800 drive(s) and shall be conformed to HD Cam SR, except as expressly noted below.

1. **Music and Effects Version (delivered on DVD DATA Disc, conformed to HD master)**
   The 6+2 music and effects mix, which was recorded as 24-bit files at a sample rate of 48.000 kHz at a 24.0 frames per second film speed, broken down into reels.  These tracks are broken out as: fully filled 5.1 M&E, Optional "A" Material, and Dialog Guide.

Note that in addition to the mono Optional material on the "6+2" that contains mouth noises and breaths that may or may not want to be used in the creation of foreign language versions.

2. _Video Mixes_ The following elements, all recorded as 24-bit files at a sample rate of 48.000 kHz at 23.97 frames per second film speed, matching the requirement of U.S. DVD mastering and digital videotape formats:

   i.   5.1 printmaster

   ii.  2.0 Lt-Rt English printmaster, with peaks limited to +14 above -20 dBFS

   iii. 2.0 Lt-Rt M&E

   iv.  M&E Optional A

   v.   Dialog Guide

3. _Music Stems_
   To be delivered on disc or hard drive.

   Music D/M/E- to be provided as pro tools session

4. _Music_
   Physical delivery of CD or DVD containing any and all mixed source and score music, and all songs used in the film.

5. _Closed Caption Files_
   Closed caption files, conformed to both HD and SD masters.

17/30

6.  Trailer
Access to the 2K version of the trailer with audio at true 24fps, if and as available  AND delivery of HDCAM SR of the trailer with D/M/E on separate CD.  In addition, music cue sheet of the trailer and evidence that the trailer is cleared for use in the Territory.

## D.  WORK MATERIALS – PICTURE ELEMENTS

1.  Trims & Outs
Access to the original masters and any other materials photographed or recorded in connection with the production of the Picture, together with detailed schedules thereof.

2.  Title/Miscellaneous Artwork
Access to any photographic and non-photographic material used to generate main titles, end titles, inserts, local titles, dates, translations, captions, mattes, overlays and opticals, including but not limited to, intermediates, original negatives, Hi Con units, artwork, etc.

3.  Title Elements: Main/End Titles
Physical delivery of all digital files which shall contain all final main title and end titles/credits cut to length as used in the Picture (as approved by ARC) to be used as needed for creation of video masters so that all main and end titles will fall within television safe title.  Titles should be delivered on hard drive or disc as EPS, Illustrator or other vector based formats. Licensor shall also deliver one (1) Microsoft Word formatted disk containing titles in the same format and font as on screen.  Physical delivery of the above shall be in the native language of the Picture and in English.  Any and all logos shall be delivered/included as hi res files.

## E.  WORK MATERIALS - EDITORIAL & MISCELLANEOUS

1.  English Subtitle File
If the film is in any language other than English, provide one (1) copy of an English subtitle file electronically or on a CD in a Microsoft Word format.

2.  Lab List
One (1) copy of a complete listing (with all contact details) of all laboratories and other facilities in which any work on the Picture was done (see Exhibit B attached hereto).

3.  General Fact Sheet
One (1) copy of a completed general fact sheet (see Exhibit C attached hereto).

## F.  PUBLICITY

1.  Unit Still Photography
Physical delivery of any available, fully cleared original unit and special shoot photography taken in connection with the Picture, with contact sheets, and duplicates of all images on disk, scanned in 18-20 meg (or higher) files. All images must be clearly identified.  Licensor shall not deliver any black & white photography that has been converted from original color images.

2.  Logos
Hi res digital files of all logos to be included in the billing block.

3.  Electronic Press Kit
Access to any available behind the scenes and/or B-roll footage to be used in the creation of an EPK, which footage shall be owned by Licensor and fully cleared for use by ARC.

4.  DVD Extras

18/30

Physical delivery of 10-bit uncompressed Quicktime files of all final DVD bonus materials, including but not limited to, interviews, commentary, and behind the scenes footage and as supplied to Licensor, in each case fully cleared for use by ARC.

**G.    DOCUMENTATION – If applicable and reasonably requested by ARC**
All documents and paperwork below shall be (i) delivered in the English language, (ii) fully executed, if applicable and (iii) clearly legible. Documents delivered by CD-ROM must be clearly labeled.

1.   **Laboratory Access Letters:** Fully executed Laboratory Access Letter(s) with inventory lists attached in substantially the form attached hereto as Exhibit "LA", granting Distributor irrevocable access during that Term of the elements pursuant to this Delivery Schedule. The Laboratory Access Letters must be fully signed by the Laboratories and Company and must include but not be limited to:

    i.   All DCDM project and master file elements; and

    ii.  Pre-sweetened edited video masters or QuickTime video files; and

    iii. Pre-mixed audio 5.1 stems.

2.   **US Copyright for Screenplay:** Copy of the Form PA (or Form CO) Certificate of United States Copyright Registration stamped by the Library of Congress for the screenplay. If the stamped certificate has not been returned from the Library of Congress, Company shall deliver a copy of the application for filing and proof of payment of the registration fee that accompanied the application to the U.S. Copyright Office. Company shall deliver one copy of the stamped Certificate of Copyright Registration for the screenplay once Company has received the same from the Library of Congress;

3.   **US Copyright for Motion Picture:** Copy of the Form PA (or Form CO) Certificate of United States Copyright Registration stamped by the Library of Congress for the Picture. If the stamped certificate has not been returned from the Library of Congress, Company shall deliver a copy of the application for filing and proof of payment of the registration fee that accompanied the application to the U.S. Copyright Office. Company shall deliver one copy of the stamped Certificate of Copyright Registration for the Picture once Company has received the same from the Library of Congress;

4.   **Chain of Title:** One set of all documents comprising the full and complete chain-of-title for the Picture along with a concise summary cover sheet briefly describing each document. All documents in the chain-of-title must be fully executed. Such Chain-of-Title Documents shall include (i) an assignment of rights in and to the underlying property, (ii) the certificate of authorship from the writer(s) of the screenplay on which the Picture is based, (iii) all agreements with respect to the music utilized in the Picture and trailers (e.g., all composer agreements and synchronization and master use licenses, soundtrack agreements, if any, and complete music cue sheets) (see below); (iv) documents establishing Company's rights in the Picture and Company's valid copyright, and the registration thereof, under applicable law, of the Picture; (v) a current (within one (1) month of the Delivery Date) US Copyright report and (vi) a current (within one (1) month of the Delivery Date) title report with opinion indicating the title of the Picture is cleared for use. In addition, if the Picture is based upon or incorporates, in whole or in part, the life stories of any real persons, whether currently living or deceased, or in any way is based upon, or draws from, incidents, events or other parts of such persons' lives, or in any other way is related to any such persons so as to make necessary or desirable releases, consents, waivers or any other authorizing documents from such Persons in connection with the Picture (collectively, "Personal Releases") then the Chain-of-Title Documents will include fully executed copies of such Personal Releases. Copies of all Chain-of-Title Documents shall be delivered by Company to Distributor not later than thirty (30) days

19/30

from the date of this Agreement. If any such documents are not timely furnished to Distributor, or if Distributor disapproves any such documents after having notified Company of its concerns with respect thereto, Distributor shall have the option of terminating the Agreement and recovering immediately any unrecouped payments made to Company hereunder. If any Chain-of-Title Documents are in a language other than English, Company shall provide, in addition to the original language copies thereof, English-language translations thereof which have been rendered, and are certified by, a professional translator. If any documents are not so translated, or if for any reason Distributor believes, in good faith that any translation provided is unreliable or otherwise unacceptable, then Distributor may elect to obtain its own English-language translations;

5. **E&O Certificate and Endorsement:** Company shall procure and maintain in full force and effect standard Producer's and/or Distributor's Errors & Omissions Liability insurance issued by a nationally recognized insurance carrier licensed in the states or countries where Picture will be distributed and assigned an A.M. Best Guide Rating of at least A:VII covering the Picture with minimum limits of at least $3,000,000 for any claim arising out of a single occurrence and $5,000,000 for all claims in the aggregate. Company shall deliver to Distributor an original Certificate of Insurance and Additional Insured and Primary/Non-Contributory Endorsements signed by an authorized agent of the insurance company as part of delivery in accordance with the Delivery Schedule. Such insurance:

    i.   shall be written on an occurrence basis with a rights period endorsement for the duration of the Term;

    ii.  shall carry a deductible no larger than $25,000. Company shall be responsible for all deductibles and retentions under Company's policies;

    iii. shall be endorsed to name Distributor its parent(s), subsidiaries, licensees, successors, related and affiliated companies, and their officers, directors, agents, employees, representatives and assigns as additional insureds (collectively & individually the "Additional Insureds");

    iv. shall be endorsed by the insurance carrier to indicate coverage is primary and any insurance maintained by the Additional Insureds is non-contributory;

    v.  shall have an endorsement stating it is not subject to any non-standard exclusions from, restrictions of or limitations in coverage in accordance with industry standards;

    vi. shall have an endorsement stating fair use coverage is included (documentary pictures only);

    vii. shall have an endorsement stating the title of the Picture, music, film clips and copyright coverage is included;

    viii. shall provide coverage for any claims related to the Picture, and advertising and promotion materials with respect thereto, during the Coverage Period; and

    ix. may not be cancelled without first providing the Additional Insureds with 30 days written advance notice of cancellation or non-renewal.

6. **MPAA CARA Certificate:** Copy of the original CARA certificate from the MPAA rating for the Picture with a rating no more restrictive than "R" along with the nomenclature, if any;

7. **Exhibit A: Short Form Assignment:** two (2) original, signed and notarized short-form licenses in the form of Exhibit "A";

20/30

8. **Exhibit B- Mortgage of Copyright:**  two (2) original, signed and notarized Mortgage of Copyright and Security Agreement in the form of Exhibit "B";

9. **Certificates of Origin:**  two (2) original, notarized Certificates of Origin;

10. **Billing Block:**  Stat of the contractually correct billing block for the Picture which must include:

    i. exact placement, wording and size of each <u>paid advertising credits;</u>

    ii. stats of any <u>Company Logos</u>  and <u>all required logos</u> that must to be affixed to such billing block; and

    iii. the <u>Copyright line</u> for the Picture .

11. **Main and End Titles:**  A copy of the final main and end titles of the Picture via PDF, on CD or DVD;

12. **Credit Statements/ Paid Ad Restrictions/ Name and Likeness:** A complete, accurate and typewritten statement (or statements, as the case may be) in the English language of any and all third-party screen and paid advertising credit, name and likeness and other third party obligations, restrictions and approval rights with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions, consultation rights and/or approval rights (including any tie-in obligations) attached thereto. The format of the statement should include all individuals and entities that are accorded credit in the billing block and shall be listed in the order of how those individuals appear in the billing block. If there are no screen credit obligations, paid advertising and credit obligations and/or name and likeness restrictions, a signed written statement upon which Distributor may rely must be provided by Company;

13. **Dubbing/Subtitling Restrictions:**  A complete, accurate and typewritten statement in the English language of any and all restrictions as to the dubbing of the voice of any player, including dubbing dialogue in a language other than the language in which the Picture was recorded or of any cutting/editing restrictions (other than as set forth in the Agreement), If there are no such dubbing or cutting/editing restrictions, a signed written statement upon which Distributor may rely must be provided by Company;

14. **Sound License:** A copy of the fully executed sound license for the Picture (i.e., Dolby SR and SRD);

15. **Music Cue Sheet:**  A copy, via PDF, CD or DVD or similar professional format copies of a music cue sheet in the English language showing the particulars of all music contained in the Picture and any completed Trailers delivered hereunder, including the title of each composition, and with respect to each composition; (i) the names of composers; (ii) the names of publishers (including percentage of ownership if more than one publisher); (iii) the usages (whether background instrumental, background vocal, etc.); (iv) the place for each composition showing the film footage and running time for each cue and the (v) performing rights society involved.  All the information above should be included within one document. If applicable, one (1) copy of any narration agreement(s) used in connection with the Picture or any trailers delivered by Company to Distributor pursuant to this Agreement. If any composition is within the public domain, Company shall identify such composition(s) in writing;

16. **Music Documentation/ Composer:**  One (1) copy of each of the signed composers, lyricist and/or publishing agreements entered into for the original music composed for and

21/30

embodied in the Picture. One (1) copy of all agreements and other documentation relating to the music rights (and evidence of payment in full with respect to all such documents) including, without limitation, all composer/songwriter agreements; recording artist/master recording; producer agreements; copies of any applicable union or guild agreement and session reports; day players/vocalist agreement; master use licenses; synchronization and performing licenses; and film clips (including music track portions thereof); certificates of authorship; and phonorecord agreements if done by Company. All licenses must be and remain in full force and effect and must permit the reproduction and distribution in all media, now known or hereinafter devised, throughout the Term and in the Territory at no additional cost to Distributor (including, but not limited to, all future media (including the internet) as defined in the Agreement). In addition, the information in the licenses must agree with the information provided in the music cue sheet;

17. **Music Documentation/ Master Use and Synch:** Copies of each of the synchronization and performing right licenses (fully executed) and all master use licenses (fully executed) for all non-original music embodied in the Picture. Company shall provide proof of payment for all synchronization and master use licenses. All licenses must be and remain in full force and effect and must permit the reproduction and distribution in all media, now known or hereinafter devised, throughout the Term and in the Territory at no additional cost to Distributor (including, but not limited to, all future media (including the internet) as defined in the Agreement). In addition, the information in the licenses must agree with the information provided in the music cue sheet;

18. **Cast and Crew Agreement:** If reasonably requested by Distributor, copies of all agreements or other documents relating to the engagement of personnel in connection with the Picture not set forth above (including those for individual producers, directors, artists and conductors) for all individuals and entities accorded credit in the billing block;

19. **Additional Clearance Documents:** All other clearance documentation for the Picture not set forth above as may be requested by Distributor in form and substance satisfactory to Distributor. If the Picture contains stock footage and/or film clips, Company shall deliver a list of scenes (identified by slate, take and key numbers with a brief description of the scene), which contains the stock footage and/or film clips. Such stock footage and/or film clips must be cleared for worldwide use in perpetuity (including any music soundtrack portions thereof). Delivery must include any applicable stock footage/film clip fully executed licenses. If there are not stock footage/film clips, a signed written statement upon which Distributor may rely must be provided by Company;

20. **SAG Final Cast List:** A copy of the SAG final cast list (the "SAG Final Cast List") and, if and to the extent not included therein, the following information: (a) for the Picture: shooting location(s); start and completion dates; production company name, federal and state identification numbers, address (including zip code), phone number and contact names; and, if applicable, conversion rates used for payments made in foreign currency; and (b) for each SAG member and other cast member who worked on the Picture: name, social security number, and, if applicable, personnel service company name and federal identification number; address (including zip code); number of days and weeks worked; start and finish dates; location(s) worked; gross salary; base salary; salary units; time units; total units; player type; type of contract (i.e., daily or weekly); and guild membership;

21. **Director/Crew List and DGA Determination Letter:** A statement with Name, Address, and SSN or Fed ID if using Loan Out Company for all directors and crew affiliated with the Director's Guild of America. DGA Credit Determination Letter (if there were more than one individual in any category: Director, UPM, 1st AD, 2nd AD)

Ex. A - 22

**22. IATSE:** A checklist for Proration of Post '60s and Supplemental Markets Monies form or the prorated percentage payable to IATSE.

**23. Guild/Union Residual Schedule:** A list of all applicable guilds/unions used for the Picture (ex. SAG, WGA, DGA, IATSE, etc.). Company warrants that it shall deliver a complete residual schedule and agrees to indemnify Distributor against any penalties, fees, charges, expenses, and the like which Distributor incurs as a result of Company's failure to deliver a complete guild/union residual schedule;

**24. Certification to Attorney General:** A copy of any and all certification(s) provided to the Attorney General in connection with the Program in compliance with 18 U.S.C. 2257A(h) and any successor statute or similar law or regulation;

**25. Canadian Production:** If the Picture is a Canadian production, one (1) original certificate issued by the Canadian Audio Visual Certification Office (CAVCO) consisting of Part A: Canadian Film or Video Production Certificate and Part B: Certificate of Completion;

**26. Final Negative Cost:** If reasonably requested by Distributor, one (1) Final Certified Negative Cost Statement certified by Completion Guarantor (and if no completion guarantor was engaged for the Picture, then by Company's outside certified public accountants as approved by Distributor) evidencing a Minimum Negative Cost; and

**27. German Tax Form:** If applicable, one (1) completed German tax form.

**28. Certificate of Good Standing:** One certificate of good standing from the state in which the Company was formed. If Company was formed in any country other than the United States of America, the equivalent of a certificate of good standing with the domestic country's appropriate government agency.

23/30

**EXHIBIT A – only if applicable**

**LABORATORY ACCESS LETTER FOR "[THE PICTURE]"**

Date:

**[INSERT LAB NAME]** (the "Laboratory")
**[INSERT LAB ADDRESS]**

Ladies and Gentlemen:

1.    PICTURE/TERM/TERRITORY:  The undersigned, **[LICENSOR]**, ("Licensor") has granted to ARC Entertainment, LLC ("ARC") an exclusive license to manufacture, market, distribute, exhibit and otherwise exploit the motion picture entitled "**[THE PICTURE]**" (the "Picture") for a distribution term expiring **[INSERT EXPIRATION DATE]** (the "Term") for the territory of **[INSERT TERRITORY]** (the "Territory").

2.    MATERIALS:  Laboratory confirms that the materials as set forth on the attached Annex I (the "Material") are currently in Laboratory's possession, and are satisfactory for the manufacture of commercially acceptable technical video masters, network broadcast quality standard masters and duplicate pre-print material, as applicable.

3.    ARC'S ORDERS:  This will authorize, direct and instruct Laboratory to fill all orders of ARC or ARC's designees at any time during the Term for duplicate material or positive prints of the Picture as ARC or ARC's designees shall request at the sole cost and expense of ARC or ARC's designees.

4.    NO CLAIM:  Notwithstanding any claim or lien which Laboratory may now or hereafter assert against Licensor or others with respect to the Picture or any of the Material, Laboratory agrees that it shall not, by asserting or enforcing any such claim or lien, refuse to accept or perform any requests placed by ARC or ARC's designees as herein provided.  Conversely, notwithstanding any claim or lien which Laboratory may now or hereafter have or assert against ARC or others or against the Picture or any of the Material, Laboratory agrees that it shall not, by asserting or enforcing any such claim or lien refuse to accept or perform any requests placed by Licensor or Licensor's designee as herein provided.

5.    IRREVOCABILITY:  The instructions, authorizations and directions herein contained in favor of ARC are being relied on by ARC and are coupled with an interest and may not be revoked, rescinded or in any way modified without the written consent of ARC.

6.    FACILITY ACKNOWLEDGMENT:  By signing in the space provided below, Laboratory agrees that it will fill all orders from ARC or ARC's designees, as the case may be, in accordance with the authority granted herein without regard to any liability or obligation of Licensor or any third party and Laboratory agrees to be bound by the foregoing instructions and directions.

By signing in the spaces provided below, the signatories agree to all of the terms and conditions herein set forth.

Very truly yours,
"Licensor"


By:_____
Title:

Acknowledged and agreed:
"Laboratory"


By:_____

24/30

Ex. A - 24

Title:

ARC Entertainment, LLC

By:_____
Title:

25/30

**LABORATORY ACCESS LETTER FOR "[THE PICTURE]"**

ANNEX 1

26/30

**EXHIBIT B**

**LAB LIST FOR "[THE PICTURE]"**

The following items for the Picture are indicated by the letters and numbers listed in the Delivery Schedule.

| **Type of Lab** | **Name & Contact Info for Lab** | **Elements in Possession by Lab** |
|---|---|---|
| **Film Lab** | | |
| **Sound Lab** | | |
| **Video Lab** | | |
| **Optical/Title Lab** | | |
| **Visual Effects Lab** | | |
| **Negative Cutter** | | |
| **Digital Scanning & Recording** | | |
| **Negative Vault** | | |
| **Script Continuity Facility** | | |

## EXHIBIT C

### GENERAL FACT SHEET FOR "[THE PICTURE]"

Questionnaire Completed by: _____ Date: _____

Production Company (or Licensor): _____

Telephone No.: _____ Fax No: _____

Original Program Title: _____

Alternate Title (if any): _____

Foreign Language Title (if any): _____

Language of Original Version: _____

Is Program Subtitled? _____ In What Language(s)? _____

Is Program Dubbed? _____ In What Language(s)? _____

Color or B&W? _____ Main & End Titles Over Black? _____

Number of Reels: _____ Length of Film in Feet: _____

Running Time in Minutes: _____ Film Stock Used (Kodak, etc.): _____

Aspect Ratio: _____ Super 35? _____ If Yes, Common Center or Top? _____
_____

Genre (Drama, Comedy, Musical, etc.): _____

Principal Photographic Locations: _____
_____

Period of Principal Photography: _____
_____

Copyright Notice in U.S.? _____ Year of Production: _____
_____

Name of Copyright Owner/Claimant & Address: _____

_____

Copyright in Other Countries (specify): _____

Name of Author for Copyright Purposes of the Following:

      Underlying Property: _____ Citizenship: _____

      Screenplay: _____ Citizenship: _____

      Film: _____ Citizenship: _____

28/30

Date of First Lawful Availability to Public (if previously distributed): _____

Date & Location of First Public Screening (if previously distributed): _____

Initial U.S. Theatrical Release Date (if previously distributed): _____

Foreign Release Dates (if previously distributed):

| Country | Date |
|---|---|
|  |  |
|  |  |
|  |  |

Name of Person(s) and/or Company(s) Involved in Financing of Film: _____

_____

Address: _____

Principle Executive Involved in Making of Film: _____

Address: _____

Film Production Company: _____

Address: _____

Producer(s): _____

Director: _____  DGA Accredited? _____

Writer: _____  WGA Accredited? _____

Cinematographer: _____  Unit Photographer: _____

Principal Cast Members: _____

_____

Do the Credits Comply with the Regulations Set Forth by the DGA? _____ WGA? _____

Approximate Total Cost of Production (in US $): _____

29/30

Ex. A - 29

# EXHIBIT B

# MADEL PA

700 PENCE BUILDING
800 HENNEPIN AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 605-0630
WWW.MADELLAW.COM

CHRISTOPHER W. MADEL
DIRECT DIAL
(612) 605-6601
CMADEL@MADELLAW.COM

September 8, 2017

ARC Entertainment, LLC
3212 Nebraska Avenue
Santa Monica, CA 90404

OA Investment Holdings LLC
555 Twin Dolphin Drive, Suite 615
Redwood City, CA 94065

c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

c/o Stellar Corporate Services LLC
3500 South Dupont Highway
Dover, DE 19901

Re:    *Molly Moon: The Incredible Hypnotist* Distribution Agreement

To Whom It May Concern:

I write on behalf of Motion Investment Limited and Cumulus LLC regarding your repeated, serious breaches of the May 21, 2015 Distribution Agreement ("Agreement") between ARC Entertainment, LLC, ("ARC" or "you") and Molly Moon Films, Ltd., ("MMF" or "Licensor") relating to the motion picture *Molly Moon: The Incredible Hypnotist* (the "Picture").[1] My clients are the principal financiers of the Picture.

For the reasons set forth below, as of today ARC is in breach of the Agreement on multiple fronts. ARC must **immediately** remedy its breaches of the Agreement, including full payment to MMF of all monies due under the Agreement, or the Agreement is terminated and MMF will pursue its rights in both law and equity.

This includes pursuing significant litigation against ARC and all other related companies for full payment of the royalties that are due to MMF. The Picture has been a successful film, and we have no doubt that a full and accurate accounting will show that you owe substantial payments to MMF. Provide full payment of all money owed without delay, or we will aggressively pursue our rights against you.

---

[1] A full and complete copy of the Agreement is attached to this letter. The "Effective Date" of the Agreement is listed as May 21, 2015. The Agreement was executed by ARC on July 29, 2015, and by MMF on July 28, 2015.

September 8, 2017                                                    *Via Email and U.S. Mail*
Page

## I.    The Terms of the Agreement

Under the terms of the Agreement, MMF granted ARC exclusive rights to the Picture, including rights to distribute the Picture and to receive royalties from the Picture. (Agreement ¶¶ 1 & 6.)[2] In addition, the Agreement provides ARC the right to recoup defined Distribution Expenses. (Agreement ¶¶ 9(b) & 10.)

In consideration for these rights, ARC was obligated to make a series of payments to MMF, including:

(1) Under Paragraphs 7(a)–(c) of the Agreement, eighty thousand U.S. Dollars ($80,000) in an "Advance" payment, due under the following conditions:

   a. Sixteen thousand U.S. Dollars ($16,000) due within thirty (30) days from when the Agreement was executed, subject to the receipt of chain-of-title documents and a W-9 from MMF, (Agreement ¶ 7(a));

   b. Thirty-two thousand U.S. Dollars ($32,000) due within thirty (30) days following delivery as defined in Paragraph 11 of the Agreement, (Agreement ¶ 7(b));

   c. Thirty-two thousand U.S. Dollars ($32,000) due no later than October 31, 2015, provided that MMF complied with Paragraphs 7(a)&(b) of the Agreement, (Agreement ¶ 7(c)).

(2) Under Paragraph 7(d) of the Agreement, a performance bonuses of the following amounts:

   a. For sale of "Videograms," between twenty-five and one-hundred thousand U.S. Dollars ($25,000 to $100,000), (Agreement ¶¶ 7(d)(i)–(iv));

   b. For a sale to broadcast television, twenty percent (20%) of net receipts, (Agreement ¶ 7(d)(v));

   c. For transactional VOD buys between twenty-five and fifty thousand U.S. Dollars ($25,000 to $50,000), (Agreement ¶¶ 7(d)(vii)–(viii)).

(3) Under Paragraphs 8 and 9 of the Agreement, all net receipts paid to ARC, subject to ARC withholding net receipts sufficient to recoup any advance payments, performance bonuses, or distribution expenses. (Agreement ¶¶ 8&9.)

In addition to the rights and consideration contracted under the Agreement, Paragraph 17 of the Agreement obligates ARC to provide accounting statements to MMF within forty-five (45) days of the end of each quarter. (Agreement ¶ 17.) The Agreement provides MMF two (2) years to object in writing to any accounting statement provided

---

[2] The rights granted in the Agreement include: Theatrical Rights; Non-Theatrical Rights; Videogram Rights; Digital Rights; PPV/VOD Rights; Royalty Income; and Incidental Rights.

September 8, 2017                                                    *Via Email and U.S. Mail*
Page

under Paragraph 17, otherwise such accounting statement is deemed accepted. (Agreement ¶ 17(b).)

If the Picture earns no royalties for a period of two (2) years, then the Agreement may be terminated by sixty (60) days written notice. (Agreement ¶ 5.)

## II.    ARC Has Failed to provide Accounting as Required

As of August 31, 2017, MMF has received one alleged accounting statement from ARC, dated September 30, 2016,[3] and two communications from ARC that relate to the Agreement[4]. Under the terms of the Agreement, approximately eight (8) accounting statements should have been provided to-date.

MMF has not received at least seven (7) accounting statements that ARC was obligated to provide. This failure also raises serious questions about the one accounting statement ARC has provided. Therefore, MMF hereby objects under Paragraph 17(b) of the Agreement to any such accounting provided or alleged to have been provided since September 1, 2015.

## III.    ARC Has Failed to Make any Payments

ARC was obligated to pay at least the $80,000 advance payment because all conditions for such payment have been met. In addition, ARC has failed to provide *any* net revenues and any performance bonuses under the Agreement.

## IV.    Notice of Breach and Termination Notice

Because ARC has failed to provide the necessary accounting statements, MMF currently has insufficient information to know exactly which provisions of the Agreement have been breached. This lack of information, however, does not prevent MMF from being certain that ARC is in breach of the Agreement. MMF provides the following notices under the Agreement in conjunction, noting the two are not mutually exclusive:

*Notice of Breach.*

ARC's failure to provide the necessary accounting statements is a breach of Paragraph 17 of the Agreement. ARC's failure to pay any consideration, including at least the advance payment, is a breach of Paragraphs 7(a)–(c) of the Agreement. ARC's

---

[3] The September 30, 2016 statement was brief and alleged $215,586.39 in "distribution expenses" but did not purport to provide an entire accounting of such expenses and provided no information regarding net receipts from the Picture or other consideration due to MMF under the Agreement.

[4] These include a November 2, 2016 message from Grace Chong and a February 28, 2017 message from Grace Santos.

Ex. B - 3

September 8, 2017                                                                *Via Email and U.S. Mail*
Page

failure to pay any other consideration due to MMF is a breach of Paragraphs 7(d), 8, and 9 of the Agreement. This letter constitutes notice of breach under Paragraph 21 of the Agreement.

*Termination Notice*

ARC's failure to provide accounting statements to MMF constitutes its own breach. But this failure has also deprived MMF of knowledge about the exact nature of ARC's breach. If a true and accurate accounting shows that no additional consideration is due to MMF under Paragraphs 7(d), 8, and 9 of the Agreement, then no revenues have been generated under the Agreement for at least two (2) years and MMF is entitled to terminate the Agreement under Paragraph 5. Termination under Paragraph 5 requires a written "Termination Notice" providing sixty (60) days of termination. If no revenues have been generated, then this letter constitutes written termination notice.

## V.    Demand for Cure

Following this Notice of Breach and Termination Notice, we hereby demand that you immediately, and without delay, provide the following cures pursuant to Paragraph 21 of the Agreement:

1.    Full payment of the advance under Paragraphs 7(a)–(c).

2.    Full payment of any applicable performance bonuses under Paragraph 7(d);

3.    Full payment of all net receipts due under Paragraph 9(e);

4.    All accounting statements for each quarter under Paragraph 17(a).

5.    Confirm that ARC and OA Investment Holdings are no longer representing the Picture and have removed all references to the Picture from their marketing and corporate materials, including online.

6.    All materials and written confirmations otherwise owed to MMF.

Unless full payment is made promptly and before the end of the cure period, we will be forced to proceed with litigation against you and any and all other parties obligated to pay under the Agreement. MMF will not hesitate to aggressively pursue the money you owe it and will use every available legal option to do so.

Sincerely,

Christopher W. Madel